UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PATRICK MORRIS                                    CIVIL ACTION

VERSUS                                            NUMBER: 10-3339

MICHAEL J. ASTRUE,                                SECTION: "C"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability. (Rec. docs. 13, 14).

Patrick Morris, plaintiff herein, filed the subject applications for DIB and SSI benefits on January 3, 2008, with a protective filing date of December 6, 2007, alleging disability as of March 31, 2007. (Tr. pp. 81-90, 91-95, 112). In a Disability Report that appears in the record, the conditions resulting in plaintiff's inability to work were identified as back problems, high blood pressure, vision loss, and poor literacy skills. (Tr. p.

117).  Those conditions first began to bother plaintiff on March 31, 2007 and rendered him unable to work from that date forward. (Id.).  Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on April 30, 2008. (Tr. pp. 54-57, 58-61).  Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on July 7, 2009 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 62, 20-47).  On October 19, 2009, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 8-19).  The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-5).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1)    [d]id the plaintiff meet or medically equal [L]isting 12.05C for mental retardation.

2)    [d]id the ALJ consider all of the claimant's medically determinable impairments in his residual functional capacity assessment.

3) [t]he decision clearly violates SSR 00-4p. The Judge
   failed to ask the vocational expert if his testimony is
   consistent with the Dictionary of Occupational Title[s].

(Rec. doc. 13-1, p. 1).

Relevant to the issues to be decided by the Court are the
following findings that were made by the ALJ:

1. [t]he claimant meets the insured status requirements of
   the Social Security Act through September 30, 2008.

2. [t]he claimant has not engaged in substantial gainful
   activity since March 31, 2007, the alleged onset date (20
   CFR 404.1571 et seq., and 416.971 et seq.).

3. [t]he claimant has the following impairments:
   hypertension, borderline intellectual functioning, back
   problems (20 CFR 404.1520(c) and 416.920(c)).

4. [t]he claimant does not have an impairment or combination
   of impairments that meets or medically equals one of the
   listed impairments in 20 CFR Part 404, Subpart P,
   Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and
   416.926).

5. [a]fter careful consideration of the entire record, the
   undersigned finds that the claimant has the residual
   functional capacity to perform light work as defined in
   20 CFR 404.1567(b) and 416.967(b) except claimant is
   limited to one to three step instructions.

6. [t]he claimant is unable to perform any past relevant
   work (20 CFR 404.1565 and 416.965).

7. [t]he claimant was born on March 17, 1961 and was 46
   years old, which is defined as a younger individual age
   18-49, on the alleged disability onset date (20 CFR
   404.1563 and 416.963).

8. [t]he claimant has a marginal education and is able to
   communicate in English (20 CFR 404.1564 and 416.964).

9. [t]ransferability of job skills is not material to the

determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).

10. [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. [t]he claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 13, 15, 17-19).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C §405(g); Richardson v. Perales, 402 U.S. 389, 91 St.Ct. 1420 (1970). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).

4

Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled with the meaning of the Social Security Act. Harrell v. Bowen. 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

> 1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

> 2. an individual who does not have a "severe impairment"

5

will not be found to be disabled.

       3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

       4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

       5. if an individual's impairment preclude him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 St.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the administrative hearing that was held on July 29, 2009, plaintiff was forty-eight years of age, had

completed eight grades of special education classes, and had past relevant work experience as a tractor driver, a janitorial worker, and a laborer at a sulphur products plant. Plaintiff lived with his girlfriend of twenty-five years and her son. He had no driver's license and had last driven a car in 1986 but stopped due to a lack of hand movement and an unspecified injury in 1986 with resulting balance and back problem. Plaintiff was essentially unable to read or write and had minimal math skills.

When asked why he was unable to work, plaintiff recited problems with his hands, blood pressure, back, and vision in addition to leg weakness. He had stopped driving a tractor after losing balance in his left leg and falling. His employer had reportedly tried to accommodate him with a less demanding job but a combination of balance and back problems, an inability to lift, and a tendency to drop things rendered him unemployable. Plaintiff testified that he had seen a doctor for his balance issues and additionally suffered from carpal tunnel syndrome in the left hand and gout in the right hand. His blood pressure also fluctuated wildly. Plaintiff had quit smoking three to four months earlier after smoking a pack of cigarettes per day and had stopped drinking five to six months earlier after drinking three beers per day. He had been arrested for DWI in the past but denied using drugs.

Continuing, plaintiff testified that the pain caused by his

various conditions affected his relationships with his girlfriend and stepson. Plaintiff would rise in the morning and would move around to lessen body stiffness but he tended to stay to himself secondary to pain. He testified that he could walk only extremely short distances before needing to sit down and he experienced leg numbness and back pain after sitting only fifteen minutes. Plaintiff had last been to the doctor on June 25th with such visits typically occurring every two to three months. Plaintiff testified that he had been diagnosed with problems to his lower back and hands, contradicting his earlier testimony by testifying that he had carpal tunnel syndrome in the right hand and gout in the left hand with one of the hands often becoming locked up and having to be pried open. No medication or exercises had been prescribed for these conditions but surgery had supposedly been contemplated. Plaintiff did no socializing and could only attend church for fifteen to twenty minutes before having to leave due to pain. He had three children of his own whom he rarely saw. (Tr. pp. 23-35).

Upon being tendered to his attorney for further questioning, plaintiff testified that his past janitorial and laborer jobs had been performed many years earlier. He was no longer able to work due to the combination of leg weakness and numbness, hand problems, hypertension, vision problems, and back problems. Plaintiff testified that he started working at the age of seventeen and had

worked his entire life except for a one-month period many years earlier. He had quit school after the eighth grade to help with the support of his family. Plaintiff could write his own name but had problems spelling words greater than three letters in length. He estimated that he could occasionally lift five pounds and could frequently lift two to three pounds and he had difficulty with climbing, stooping, pushing, pulling, and fine finger manipulation. Plaintiff denied any problems with grasping but then testified that he constantly dropped things such as food utensils, cups, and plates. His condition had worsened since applying for Social Security benefits and he was now known to fall down. Plaintiff prioritized his three most significant problems as his hands, his legs, and his back. (Tr. pp. 35-40).

Richard Corbin, a VE, was the next witness to take the stand. After stating that the testimony he was about to give would be generally consistent with the information contained in the Dictionary of Occupational Titles, Corbin turned his attention to plaintiff's work history. Although plaintiff only had a marginal education, Corbin testified that he had worked a "good many years", between twenty and twenty-five, where he generally earned less than minimum wage except for the time when he was driving a tractor. The latter work was described as medium in nature with an SVP of 3 and plaintiff's past janitorial work was performed at the same

9

exertional level with an SVP of 2. Plaintiff had worked through at least a part of 2007. The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who could occasionally lift/carry twenty pounds and could frequently lift/carry ten pounds; could stand/walk/sit for six hours per eight-hour workday; and, due to emotional problems, could not perform complex or detailed tasks but could perform work with simple one, two, and three-step sets of instructions. In answer thereto, the VE testified that the individual described in the hypothetical question could function as a cloth factory cutter helper or a motel cleaner with significant numbers of such jobs existing in the national and local economies. However, those two jobs could not be performed if plaintiff's testimony regarding his hands and balance problems was fully credited. (Tr. pp. 40-43).

The VE was then cross-examined by plaintiff's attorney who first asked whether the two jobs he had identified could still be performed if the individual described in the hypo had problems working with the public, had limitations in concentration persistence, or pace, and had limitations in setting goals and planning. In light of those additional limitations, the VE testified that the jobs that he had identified could still be performed as they were done without excessive contact with the

public and were simple, repetitive jobs that did not even require reading or writing. If plaintiff, who did not wear glasses, had vision problems that were susceptible of correction, the identified jobs could still be performed. However, if plaintiff suffered from radiculopathy and neuropathy in the legs such that he could only stand for a total of one hour in a day even when using a cane, there would be no jobs that he could perform. (Tr. pp. 43-46). In his closing argument, plaintiff's counsel pointed out that plaintiff had been diagnosed with borderline intellectual functioning and that the Full Scale IQ score of 70 that he had obtained along with conditions imposing significant limitations on his ability to work rendered plaintiff presumptively disabled under Section 12.05(C) of the Listing of Impairments. (Tr. pp. 46-47).

The documentary evidence that was generated during the relevant time period[1] begins with records from the St. James

---

[1] Social Security Regulations require an ALJ to develop the medical history of an individual seeking DIB and/or SSI benefits for the twelve-month period prior to the month in which the application for benefits was filed unless there is reason to believe that development of an earlier time period is necessary or unless the individual claims that his disability began less than twelve months before the application for benefits was filed. 20 C.F.R. §§404.1512(d), 416.912(d). In the latter situation, the individual's medical history is to be developed beginning with the month that the disability allegedly began unless there is reason to believe that the disability began earlier. 20 C.F.R. §§404.1512(d)(2), 416.912(d)(2). Here, plaintiff protectively filed his applications for benefits on December 6, 2007 and alleged disability as of March 31, 2007, a period of less than twelve

Parish Hospital ("SJPH") Emergency Department where plaintiff was seen on November 9, 2007 for complaints of chronic hematuria of two weeks' duration as well as lower back and right leg pain with his medical history being positive for back problems. A musculoskeletal examination revealed no significant abnormalities with plaintiff's motor skills being intact and his extremities being weightbearing and capable of a full range of motion. Plaintiff was administered Toradol and Bactrim at the hospital and urinalysis revealed no signs of blood. The diagnosis was back pain and hematuria and plaintiff was discharged home in good condition with prescriptions for additional Toradol and Bactrim. (Tr. pp. 169-176).

On December 4, 2007, plaintiff was seen at the Earl K. Long Medical Center ("EKLMC") Emergency Room requesting a referral to a primary care physician for chronic back pain radiating to the right leg over the previous fifteen years. Plaintiff advised the attending physician that he had not gotten the prescriptions filled that had been given to him on November 9, 2007 but had instead taken some unknown antibiotics he had found at home which had resolved his hematuria and urinary symptoms one week earlier. Plaintiff had 2+ reflexes to all extremities and strength was 5/5

---

months earlier. As plaintiff makes no suggestion that his disability began prior to the latter date, the relevant time period thus begins in March of 2007.

throughout but there was tenderness to palpation of the right posterior flank. The diagnosis was hypertension and gout. Plaintiff was cleared to return to work activity the following day except for that involving lifting of more than twenty-five pounds and was restricted from strenuous activity until he was rechecked by a physician. (Tr. pp. 196, 190-192).

Plaintiff was seen again at EKLMC on February 12, 2008 for complaints of lower back that had worsened over the previous two years accompanied by balance problems. Straight leg raising was negative bilaterally. Plaintiff's lower back pain was to be evaluated further following x-ray studies and his past hematuria was to be monitored via a repeat abdominal ultrasound and a urological consultation if necessary. Various tests were ordered and plaintiff was instructed to follow a low salt diet and to exercise thirty minutes per day. (Tr. pp. 260, 254).

On February 18, 2008, plaintiff was consultatively evaluated by Dr. Caxton Opere of the Koth Clinic in Baton Rouge. The chief presenting complaint was back pain for the previous two years after plaintiff had fallen off a porch. Plaintiff advised Dr. Opere that he had continued to work until recently when he noticed that he could not pick up things such as a pail of water, bend towards the left, tie his shoes, or lean in a certain way. Plaintiff indicated that he woke up in the middle of the night crying due to severe

pain and he additionally complained of weakness in the left wrist, an inability to hold onto objects, and intermittent blood in the urine and stool over the previous four months. Past medical history was positive for hypertension and hematuria.

Upon physical examination, plaintiff had a normal station and gait with no atrophy, cyanosis, clubbing, or edema. Muscle tone and strength were normal in all extremities as was hand grip. Paravertebral muscle spasm was absent, Romberg's sign was negative, and plaintiff had no difficulty getting onto the examination table. Deep tendon reflexes were normal and plaintiff could heel-to-toe walk without difficulty. The assessment was back pain possibly secondary to a renal stone with x-rays thought to be helpful in making a more definitive diagnosis; hypertension; intermittent left wrist numbness possibly secondary to carpal tunnel syndrome but with a full range of motion of the hand and wrist joints; and, hematuria with the medications that were prescribed in November of 2007 being reported as current medications and thus raising suspicion of a urinary tract stone. The use of an assistive device was not indicated. Dr. Opere concluded his report by noting that "[e]xcept for heavy lifting, [I] do not see any significant work restrictions. He should be able to engage in work that does not require frequent bending." (Tr. pp. 201-204).

On April 9, 2008, plaintiff underwent a consultative

psychological evaluation by Clinical Psychologist Fred Tuton. Plaintiff had no problems ambulating on his own but was noted to use a cane. He reported completing the tenth grade in special education classes but dropping out of school thereafter because his father had died and he needed to help care for his younger siblings. Plaintiff admitted to being arrested for not paying child support, marijuana use until two to three years earlier, and current alcohol use of one to two beers per day. Plaintiff had been employed in the past with his last job being a tractor driver which he quit in 1986 after falling off a porch and injuring his back. As a result of those back problems, plaintiff felt that he was unable to maintain employment. Plaintiff's chief complaint was described as "back problems and [a] loss of vision" since 1986. Current symptoms related to those problems were an inability to sit for long periods of time, foot and lower back pain, and numbness. Plaintiff indicated that he could perform activities of daily living including personal hygiene, dressing himself, doing household chores, and cutting the grass but could not engage in activities where lifting was involved.

As part of the evaluation process, plaintiff was administered the WAIS-III Intelligence Test, achieving a verbal IQ score of 74, a Performance IQ score of 70, and a Full Scale IQ score of 70 which were believed to be valid. However, due to plaintiff being late to

the appointment he was not given the last subtest.  Dr. Tuton's
Axis II diagnosis was borderline intellectual functioning.  The
doctor concluded his written report by observing that the medical
records that he had been provided contained a diagnosis of
hypertension and gout, conditions that plaintiff did not mention
during the course of the evaluation. (Tr. pp. 205-211).

Plaintiff failed to keep a appointment that was scheduled for
April 23, 2008 at EKLMC. (Tr. p. 261). On April 28, 2008, an
Administration psychologist reviewed plaintiff's file and set forth
her opinions in two standardized forms that were designed for that
purpose.  In the category of understanding and memory, the
psychologist indicated that plaintiff was markedly limited in the
ability to understand and remember detailed instructions and was
moderately limited in the ability to remember locations and work-
like procedures but was not significantly limited in the ability to
understand and remember very short and simple instructions.  In the
category of sustained concentration and persistence, the
psychological consultant opined that plaintiff was markedly limited
in one of the eight enumerated areas and was moderately limited in
two others but was not significantly limited in the remaining five.
In social interaction, plaintiff was thought to be moderately
limited in one area but not significantly limited in the remaining
four.  In the category of adaptation, the psychologist found that

16

plaintiff was moderately limited in three of the four enumerated areas but was not significantly limited in the other. In summarizing her conclusions in narrative form, the consultant remarked that plaintiff functioned in the borderline range of intelligence and would likely have trouble with detailed instructions but should have no problems with simple and routine, familiar, semi-skilled level work. Because of plaintiff's intellectual capacity, pace was likely to be slow and he may have difficulty interacting with the general public in time-demanding situations. Similarly, plaintiff was likely to require assistance with traveling in unfamiliar areas and would have moderate limitations with goal setting and planning. (Tr. pp. 212-215).

The second form that was completed by the psychological consultant was denominated "Psychiatric Review Technique." There, the psychologist checked off the appropriate boxes on the form to indicate that a residual functional capacity assessment was necessary and that plaintiff suffered form borderline intellectual functioning which did not precisely satisfy the diagnostic criteria of Listing 12.02 relative to organic mental disorders. In rating the functional limitations, the consultant found that plaintiff had moderate limitations in the activities of daily living and in maintaining concentration, persistence, or pace and mild restrictions in maintaining social functioning but had experienced

no episodes of decompensation. In explaining her findings, the psychologist noted that plaintiff did suffer from borderline intellectual functioning which was consistent with his allegations of poor literacy skills. However, there was no evidence of any additional mental limitations. The range of work that plaintiff could perform was limited but he should be capable of that which was of limited complexity that did not require good reading or writing skills. (Tr. pp. 216-229).

On April 29, 2008, an Administration physician reviewed plaintiff's file and set forth his findings in a "Physical Residual Functional Capacity Assessment" form, identifying the primary diagnosis as hypertension and the secondary diagnosis as degenerative disc disease. There, the medical consultant indicated that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could occasionally climb a ladder/rope/scaffolds and stoop but could frequently perform the remaining postural maneuvers; and, had no manipulative, visual, communicative, or environmental limitations. In rendering his opinions, the physician noted medical records from January 10, 2007 evidencing that plaintiff had a full range of motion in all extremities and x-rays of the lumbar spine revealing minimal

narrowing at the L5-S1 disc interval which may represent mild degenerative disc disease. (Tr. pp. 244-231).

On May 22, 2008, EKLMC personnel reviewed plaintiff's chart and noted that he had not undergone various recommended tests. Plaintiff was to return to the Clinic on an as needed basis at which time his condition was to be discussed. The records note that plaintiff was in the process of pursuing Social Security benefits for low back pain. (Tr. pp. 258-259). On May 27, 2009, plaintiff presented to the EKLMC Emergency Room with complaints of increased back pain and pain and weakness to the left hand and wrist for over a year. Plaintiff also complained of a pulling sensation to the right fourth finger for the previous six months which tended to curl up into his palm. Plaintiff sought medication for back pain which he had suffered from for twenty years. Upon physical examination, plaintiff was alert and in no apparent distress but he was noted to use a cane. He had a full range of motion to the extremities and equal grip strength. The diagnosis included hypertension, wrist pain, trigger finger to the right fourth finger, and chronic low back pain. Plaintiff was prescribed HCTZ for his blood pressure and Naproxen for back and hand/wrist pain and was to consult with a primary care physician and an orthopedist. (Tr. pp. 252-253).

The final treatment records admitted below document

plaintiff's visit to the EKLMC Clinic on June 25, 2009. Complaints at the time included headaches, blurry vision, blood in the stool, increased low back pain, weakness on the left side of the body, and insomnia secondary to pain. Again, plaintiff was noted to ambulate with a cane but strength was 5/5 throughout and straight leg raising was negative. The assessment included weakness of unknown etiology, possibly a residual deficit secondary to a stroke, but plaintiff's hand grip/strength was within normal limits; a history of hematuria; a history of congestive heart failure with an unknown ejection fraction but a positive echocardiogram; and, low back pain. Testing was to be conducted and plaintiff was prescribed Elavil and was to return to the Clinic in three months. (Tr. pp. 256-257). As noted earlier, the hearing before the ALJ would subsequently go forward on July 7, 2009. (Tr. pp. 20-47).

Plaintiff challenges the Commissioner's decision to deny Social Security benefits on three grounds. In the first of those, plaintiff alleges that his condition satisfied the criteria of Listing 12.05(C) relative to mental retardation and that he should have been awarded DIB and SSI benefits on that basis. Plaintiff argues that a diagnosis of mental retardation is not necessary to satisfy the criteria of Listing 12.05(C) which only requires a valid verbal, performance, or full-scale IQ score of 60 to 70 and a physical or other mental impairment imposing additional and

significant work-related limitation of function.

Section 12.05(C) of the Listing of Impairments provides that an individual will be considered presumptively disabled if he suffers from:

> *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
>    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;...

If the third step of the five-step sequential analysis under §§404.1520 and 416.920 is reached, it is the claimant who bears the burden of proving that his impairment or combination of impairments meets or equals a Listing. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999). "For a claimant to show that [his] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990).

In Randall v. Astrue, 570 F.3d 651 (5th Cir. 2009), the Fifth Circuit made it clear that "... every mental disorder listing

includes two independent components: a diagnostic description of the disorder and specific criteria measuring the disorder's severity." Id. at 658 (footnote omitted). A claimant thus bears the initial burden of demonstrating that his impairment satisfies the diagnostic description of a particular Listing's introductory paragraph. Id. at 659. The diagnostic description for Listing 12.05 first requires an independent showing of "...significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Id. at 659-60. If the claimant makes that independent showing and the inquiry proceeds to the severity criteria set forth in subsection "C" of Listing 12.05, the ALJ may make factual determinations on the validity of the IQ test scores that said subsection requires. Muse v. Sullivan, 925 F.2d 785, 789-90 (5ᵗʰ Cir. 1991)(citing Pierre v. Sullivan, 884 F.2d 799, 803 (5ᵗʰ Cir. 1989)). In Muse, for example, the ALJ discounted the claimant's full scale IQ score of 58 based, inter alia, on the fact that he had worked as a truck driver and had never been fired from a job because he could not comprehend, remember, or carry out the mental rigors of work. Id. at 789-90. While a formal diagnosis of mental retardation is not required to satisfy the criteria of Listing 12.05(C), Maresh v. Barnhart, 438 F.3d 897, 899 (8ᵗʰ Cir.

2006), the lack of such a diagnosis under Axis II is probative of an IQ score's invalidity. <u>Medina v. Astrue</u>, 2009 WL 6498265 at *4-5 (W.D. Tex. June 2, 2009), <u>adopted</u>, 2010 WL 2079948 (W.D. Tex. May 21, 2010); <u>Felver v. Barnhart</u>, 243 F.Supp.2d 895, 904 (N.D. Ind. 2003).

In addressing plaintiff's first challenge to the Commissioner's decision, the Court initially notes that plaintiff did not identify mental retardation as a basis for disability in his applications for Social Security benefits, instead listing only poor literacy skills. <u>See</u> <u>Pierre v. Sullivan</u>, 884 F.2d 799, 802 (5th Cir. 1989). Be that as it may, in his written decision of October 19, 2009, the ALJ properly recalled the mandate of <u>Randall</u> to first consider the diagnostic characteristics of an alleged mental impairment and then the functional limitations resulting from the impairment. (Tr. p. 13). At step three of the sequential analysis, the ALJ opined as follows:

> [o]n the face of the record, it appears the claimant has a combination of impairments that meet the requirements of Section 12.05C of Appendix 1 as he has a valid full scale IQ of 70 and another mental impairment imposing additional and significant work-related limitations of function. However, this conclusion is not supported upon closer examination of the evidence.
> Although the claimant has the IQ score of 70, he has not been diagnosed with mental retardation. His verbal IQ was 74 and he had a performance IQ of 70. Dr. Tuton diagnosed borderline intellectual functioning.

> (Tr. p. 15).

23

Essentially, the ALJ questioned the validity of the IQ score of 70 based upon the psychologist's diagnosis of borderline intellectual functioning and his failure to render a diagnosis of mental retardation under Axis II. As far as the record reflects, plaintiff has never received medical treatment for any emotional or mental problems. Although he attended special education classes at school, that fact alone is not dispositive and plaintiff dropped out of school to help care for his siblings rather than for poor academic performance. At the administrative hearing, the VE properly recalled that plaintiff had worked a "good many years", some twenty to twenty-five. Plaintiff's ability to engage in such activities after the age of twenty-two does not evidence mental retardation as Listing 12.05(C) requires. Caradine v. Astrue, 2009 WL 3769771 at *4 (N.D. Miss. Nov. 10, 2009)(citing Muse, 925 F.2d at 789-90); Bullard v. Astrue, 2009 WL 3101002 at *8 (S.D. Tex. Sept. 23, 2009). See also Vaughan v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995); Fraga, 810 F.2d at 1305 n.11 (ability to work despite condition supports a finding of "not disabled"). Simply put, plaintiff has not carried his burden of proving the diagnostic criteria of Listing 12.05(C) by demonstrating: 1) significantly subaverage general intellectual functioning and 2) deficits in adaptive behavior, 3) which manifested themselves before the age of twenty-two. Caradine, 2009 WL 3769771 at *4. This claim is

rejected.

Plaintiff's second challenge to the Commissioner's decision is that the ALJ failed to consider all of his severe medically determinable impairments in violation of Social Security Ruling ("SSR") 96-2p. Plaintiff argues that his treating physician diagnosed him as suffering from gout, degenerative disc disease, and sciatica, impairments that the ALJ allegedly failed to consider.

The Regulations make clear that the mere existence of a condition or an impairment does not result in an automatic award of Social Security benefits; any given condition must be "severe", one that significantly limits an individual's ability to do basic work activities, and it must also prevent the individual from performing his past relevant work and any other available work. 20 C.F.R. §§404.1520, 416.920. As respects plaintiff's gout, he failed to identify that as a disabling condition in his applications for Social Security benefits and accompanying paperwork. Pierre, 884 F.2d at 802. In any event, in his written decision the ALJ did acknowledge plaintiff's hearing testimony regarding the existence of gout (Tr. p. 17) which the Court cannot help but notice was variously testified to as affecting first plaintiff's right (Tr. p. 28) but then his left (Tr. p. 31) hand.

In terms of documentary evidence, the record contains but one

diagnosis of gout affecting an unspecified area that was rendered on December 4, 2007 but strength was 5/5 throughout and plaintiff was cleared to perform work activity the following day except for that involving lifting greater than twenty-five pounds or "strenuous activity." When evaluated by Dr. Opere on February 18, 2008, plaintiff had normal muscle tone and strength, including grip strength, and a full range of motion to the hand and wrist joints. In rendering his consultative report, Dr. Tuton remarked that plaintiff had made no mention of gout during the course of the evaluation notwithstanding the isolated diagnosis noted above. On May 27, 2009, EKLMC personnel found that plaintiff had a full range of motion to the extremities with equal grip strength and on June 25, 2009, Clinic examiners found 5/5 strength throughout and plaintiff's hand grip and strength to be within normal limits. In light of this evidence, the ALJ was correct in not imposing any specific gout-related limitations in assessing plaintiff's residual functional capacity to work.

As respects the ALJ's alleged failure to consider plaintiff's degenerative disc disease and sciatica, the Court first notes that plaintiff alleged disability due to, <u>inter alia</u>, generalized "back problems" which the ALJ found to be a severe impairment. Those musculoskeletal issues were not further broken down by the specific condition of degenerative disc disease or the symptom of sciatica

that can accompany it. The ALJ duly cited medical records from SJPH dated January 10, 2007, over two months before the alleged onset date, containing x-ray results of minimal narrowing at L5-S1 which "may" represent mild degenerative disc disease. However, the diagnosis on that date was back pain and sciatica, not degenerative disc disease itself. (Tr. p. 178). Plaintiff's own treating physicians had cleared him to perform work within the exertional level that was later arrived at by the ALJ and Dr. Opere had only restricted him from heavy lifting and frequent bending. None of plaintiff's treating physicians had ever declared him to be disabled. See Vaughn, 58 F.3d at 131. Having found that plaintiff did not suffer from a condition that satisfied the criteria of one of those set forth in the Listing of Impairments and in light of the evidence before him, the ALJ proceeded to assess plaintiff as having the residual functional capacity to perform light-level work. That determination was within the exclusive province of the ALJ, 20 C.F.R. §§404.1546(c), 416.946(c), and it properly took into account the limitations resulting from plaintiff's "back problems". This claim is without merit.

In his third and final challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to ask the VE if his testimony was consistent with the information contained in the Dictionary of Occupational Titles ("DOT") in violation of SSR 00-

4p.  This challenge is easily disposed of.

A review of the transcript of the administrative hearing that was held on July 7, 2009 reveals the following exchange between the ALJ and the VE at the outset of the latter's testimony:

Q:  Are you familiar with jobs both in the local and national economy?

A:  Yes, sir.

Q:  Are you familiar with the various exertional levels defined in the Dictionary of Occupational Titles and Social Security regulations.

A:  Yes, I am.

Q:  Is your testimony generally going to be consistent with the Dictionary of Occupational Titles?

A:  Yes, it will.

(Tr. pp. 40-41).

Contrary to plaintiff's present assertion, a review of the foregoing exchange readily reveals that the ALJ did in fact ask the VE if his testimony would be consistent with the DOT to which the VE answered in the affirmative. Moreover, plaintiff having failed to cross-examine the VE about any alleged conflicts between his testimony and the DOT, he cannot pursue that as a reversible error here.  <u>Carey v. Apfel</u>, 230 F.3d 131, 146-47 (5th Cir. 2000).  Even assuming that a violation of SSR 00-4p did occur, plaintiff has not shown that he was prejudiced thereby as he points to no additional evidence that might have led to a different decision.  <u>Barratt v.</u>

Astrue, 2008 WL 2325636 n.1 (5th Cir. June 6, 2008); Jackson v. Astrue, 2011 WL 4943547 at *11 (N.D. Tex. Aug. 23, 2011), adopted, 2011 WL 4940998 (N.D. Tex. Oct. 17, 2011). This challenge presents no basis for overturning the Commissioner's decision.

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this __13th__ day of ____December____, 201_ .

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

29